UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YASSER CHAMI,

      Plaintiff,                                    Case No. 04-71779

v.                                            Honorable John Corbett O'Meara

AMERICAN AIRLINES, INC., and MEL
CARLINGTON,

      Defendants.
_____/

**MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' JUNE 6, 2005 MOTION TO STRIKE AFFIDAVIT;
DENYING PLAINTIFF'S JUNE 16, 2005 MOTION TO STRIKE AFFIDAVIT;
AND DENYING DEFENDANTS' APRIL 29, 2005 MOTION FOR SUMMARY JUDGMENT**

This matter came before the court on Defendants' June 6, 2005 motion for summary judgment and the parties' motions to strike affidavits. Plaintiff filed a response to the dispositive motion May 26, 2005; and Defendants filed a reply brief June 6, 2005. For the reasons set forth on the record, the court will deny the motions to strike. For the reasons set forth below, the court will deny the motion for summary judgment.

### BACKGROUND FACTS

Plaintiff Yasser Chami is an Arab-American born in Lebanon. He emigrated to the United States at age seven and became an American citizen in 1992. He is also a practicing Muslim, although the court notes that Plaintiff did not allege discrimination based on his religious beliefs in his complaint; therefore, any allegations of discrimination based on Plaintiff's religious beliefs are irrelevant to this action.

Plaintiff began his employment with Trans World Airlines ("TWA") in July 1997. He worked at the ticket counter selling tickets, checking in luggage and providing boarding passes. He successfully passed a background check in order to do the job. Plaintiff remained with TWA and after it was purchased by defendant American Airlines ("AA"), continued to work for AA.

Plaintiff contends that "[t]hroughout his employment with Defendant and its predecessors, Plaintiff was subjected to consistent and repeated insults regarding his Arabic ancestry." Plaintiff's resp. br. at 2. Plaintiff claims that the events of September 11, 2001, "exacerbated the hostile conditions under which Plaintiff was forced to work." Id. at 4. "Comments such as 'that Arab American is a terrorist,' 'common terrorist,' ' your family did it,' ' Go back to your country,' 'We should kill all those people' and 'we should bomb them' were refrains regularly made to Plaintiff in the break room by his co-workers." Id.

Plaintiff alleges that on November 11, 2002, he was summoned out of the break room to a meeting with Mel Carlington and Kari Orr and that he had no knowledge that he was the subject of an investigation. Plaintiff says he was questioned about comments he had allegedly made to Deborah Hughes, a co-worker, in the break room in January or February 2002 about the standoff at Church of the Nativity. Hughes was said to have told a supervisor that Plaintiff became upset reading an article in *USA Today* about the events at Church of the Nativity, threw the newspaper, screamed "This is bullshit!" and then said that the "American government was behind it all, that they were no good, and that they knew about the terrorist attacks prior to it happening." Hughes dep. at 28, 42, 54-55. Hughes testified that the conversation continued and Plaintiff began yelling at her and that she spoke to other co-workers about Plaintiff, and one of them told her he had a "terrorist tattoo that he got right after Flight 800."

2

At the meeting with Carlington and Orr, Plaintiff says he was asked about his religious and political beliefs and about his tattoo and was asked to remove his shirt so they could see it.  In the response to Defendants' motion, Plaintiff filed an affidavit in which, for the first time, he explained that removing his shirt in front of a woman is not only humiliating but also against his religious beliefs.  While Plaintiff denies telling anyone that he had a terrorist tattoo, or a tattoo of the organization Hizballah, he admits he had a tattoo of the "logo" of the Hizballah organization. Apparently, no adverse employment action was taken in connection with this investigation.  He was not suspended, demoted, or disciplined in any way.

Plaintiff resigned from his job with defendant American on April 28, 2003.  Three months later he began employment with Chase Manhattan Mortgage as a loan officer assistant.  He filed this suit alleging a hostile work environment based on national origin and that he was constructively discharged.

## **LAW AND ANALYSIS**

In his response brief Plaintiff concedes that claims against individual supervisors are not cognizable under Title VII and agrees to dismiss defendant Carlington from the case.

Plaintiff asserts that AA is liable for actions beginning in February 2001, the time at which TWA and AA entered into a purchase agreement.  The purchase agreement, however, provided that the effective date of the transfer was January 1, 2002.  Plaintiff cites no law for the proposition that AA should be held liable for acts that occurred while Plaintiff was employed by TWA.  To the contrary, when AA purchased TWA, the purchase agreement also provided that AA did not assume liability for claims TWA employees asserted or may assert against TWA. Therefore, AA is liable

only for comments directed at Plaintiff from the time he began his employment with AA, January 1, 2002.

Under Title VII, a plaintiff establishes a *prima facie* case of hostile work environment based on national origin by demonstrating the following five elements: 1) the he/she was a member of a protected class; 2) the he/she was subjected to unwelcomed national origin harassment; 3) that the harassment was based on national origin; 4) that the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and 5) that the employer was liable for the harassment. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999).

Title VII reaches only harassing conduct that is severe or pervasive enough to alter the conditions of employment. The United States Supreme Court defined a hostile work environment as one that occurs only "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working condition." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Courts determine whether an environment is hostile or abusive by examining the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

In Bourini v. Bridgestone/Firestone North Am. Tire, L.L.C., No. 04-5441, 2005 U.S. App. LEXIS 5194 (6th Cir. Mar. 30, 2005), the United States Court of Appeals for the Sixth Circuit analyzed a set of circumstances similar to those in the present matter. The plaintiff had complained

4

of comparable comments made by co-workers: "I don't want to go outside and see your camel tied to my wheels"; "camel jockey"; "If it were up to me, they would put [plaintiff] in a box and send him back to his country"; and "If you'd get the sand out of your ears you'll hear me better."  In addition, his co-workers had written graffiti in the restroom disparaging the word "Islam."  The Sixth Circuit held that since these incidents were spread out over a period of five years, they were "insufficient to constitute discriminatory changes in the terms and conditions of employment." Id. at *10.  Acknowledging that several of the incidents "were offensive and highly inappropriate, the incidents collectively do not rise to the 'threatening' or 'humiliating' level of severe conduct required to create an objectively hostile or abusive work environment under Title VII, especially in light of their infrequency." Id. at *11.

In this case Plaintiff alleges in his complaint he "continued to be harassed by his co-workers" without providing additional details.  At his deposition, only a couple of the comments Plaintiff described took place during his employment with AA.  Plaintiff explained at his deposition that throughout his employment many of the comments were not directed at him, but at Arabs in general, those standing in line for tickets, for example.  Importantly, Plaintiff admitted that he had no problems performing his job and that he did not suffer any changes in his salary or work schedule.  The alleged harassment must be severe enough to have "adversely affected the employee's ability to do his or her job." Moore v. KUKA Welding Sys., 171 F.3d 1073, 1079 (6th Cir. 1999).  Plaintiff Chami has stated that he never had a problem getting his work done.  Chami dep. at 250.  That admission would preclude Plaintiff from establishing that the admittedly harassing comments were so severe or pervasive that his working conditions were altered.

To date, the record in this case is unclear about the specific comments Plaintiff alleges were made, which comments were directed at Plaintiff and which were directed toward members of the traveling public, and when those comment were made with respect to AA's ownership of the airline. It may be that defendant AA is entitled to summary judgment; however, the court must deny the motion at this time.

Constructive discharge exists only if "an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign." Yates v. Avco Corp., 819 F.2d 630, 636-37 (6th Cir. 1986). If the employment conditions meet the object test, the court must assess whether the defendant employer "imposed these conditions with intent to cause the employee to quit or at least whether the employer reasonably should have foreseen that the conditions would lead to the employee's resignation. Agnew v. BASF Corp., 286 F.3d 307, 309 (6th Cir. 2002). Ultimately, the employer's intent must be motivated by discrimination.

In this case it is arguable whether Plaintiff has shown that American intended to force him to quit. The investigation into complaints about Plaintiff's tattoo, the gravamen of his complaint, resulted in no adverse employment action against Plaintiff. He continued to work for American without incident for an additional five months before he resigned.

Plaintiff's constructive discharge claim will fail as a matter of law, however, if he cannot prevail on his hostile work environment claim. Moore v. Dartmouth College, 2001 WL 1326584 at *11 (D. N.H. 2001). Courts have held that an employee alleging a constructive discharge in addition to hostile work environment must demonstrate an even greater severity or pervasiveness

6

of harassment than the minimum required to establish an unlawfully hostile work environment. Landgrav v. USI Film Prods., 968 F.2d 427 (5th Cir. 1992); Jurgens v. EEOC, 903 F.2d 386 393 (5th Cir. 1990).

### **ORDER**

It is hereby **ORDERED** that Defendants' June 6, 2005 motion to strike affidavit is **DENIED.**

It is further **ORDERED** that Plaintiff's June 16, 2005 motion to strike affidavit or to adjourn the hearing date is **DENIED.**

It is further **ORDERED** that Defendants' April 29, 2005 motion for summary judgment is **DENIED.**

Dated: July 25, 2005                              s/John Corbett O'Meara
                                                  John Corbett O'Meara
                                                  United States District Judge